May it please the Court, my name is Eric Graffy and I am here on behalf of the Native Village of Point Hope and other appellants. I would like to reserve five minutes for rebuttal, please. This appeal concerns an important decision to offer a huge area of the pristine Chukchi Sea, nearly 300 million acres, to potential oil development. The lease sale decision transfers valuable rights over public resources into private hands. It has practical and legal consequences that cannot be undone easily. The focus of a lease sale decision is whether or not to open areas to possible oil drilling. That decision requires balancing the benefits of protecting key areas of the ocean and the benefits of development. The two flaws in the government's NEPA analysis here go to the very heart of these considerations. First, the government acknowledges that vast amounts of basic information about the Chukchi Sea are missing. This missing information, as the government acknowledges, prevents it, in many instances, from analyzing the effects of a lease sale. The information also prevents the government from meaningfully analyzing alternatives to that lease sale decision. Nevertheless, the government concludes that not a single item of missing information is essential to a reasoned choice among alternatives. It's worth noting just how extreme this conclusion is. The agency is here saying that it can make a major commitment of a public resource, even though, by its own admission, it lacks even the most basic information to inform the lease sale decision. Its conclusion eviscerates the core obligation of Section 1502.22 to gather information essential to make an informed decision. If that obligation is to have any meaning, what the government did here cannot stand. Second, the agency bases its entire analysis of the potential effects of the sale on an arbitrary assumption that conflicts with its own conclusion of how development occurs. This arbitrary assumption may have caused the EIS to dramatically understate the harm leasing could cause. The mistake likely skewed the way the agency balanced the harms and benefits that set the heart of the lease sale decision. Given the central importance of the flawed analyses, a remand here that requires a lawful assessment of missing information and the potential effects of the lease sale would likely lead to a very different decision. I'll address each of these two flaws in turn, and then I will address briefly why the regular vacature remedy is particularly important here. I'll first address missing information. This case turns on the application of a core CEQ regulation that furthers NEPA's basic requirement that agencies make informed decisions. Section 1502.22 links its information gathering requirement to NEPA's alternatives requirement. Missing information is essential if it is needed for a reasoned choice among alternatives for a particular decision. To develop and compare alternatives for a lease sale decision, the agency needs at least basic information about the ecology of areas and the impacts of oil activities. Let's get down to brass tacks. We understand the regulation and so on. If the information is not available because it's exorbitantly expensive to get and so on. So what missing information have they not found and dealt with, information that is reasonably available within the meaning of the regulation? Your Honor, our claim is that the EIS shows that without information, that there's so much missing information, that the agency cannot adequately compare alternatives or develop alternatives that minimize effects. In light of that, the limits of that analysis, the not essential conclusion is arbitrary because the regulation says I fully understand that in the abstract. What particular information is missing that you think should be there, that they should have relied on, that is therefore fatal to the EIS? It's not for us in the first instance to identify the particular pieces of essential information, but there is information missing about, for example, habitat use of bowhead whales, of walrus, and we cite those examples in the brief and I can cite examples here as well. And very basic information about what are the effects from oil drilling on animals is missing. For example, at the excerpt of record 896 through 897, the agency lists its conclusion for the effects of the lease sale on marine mammals and it concludes that because of the paucity of information about habitat areas and about the effects of noise on marine mammals, it cannot make a conclusion. It says we don't know whether or not these activities will have a significant effect on marine mammals. Now are you saying that the information is simply missing, that no one knows the information, and if you're saying that, what showing are you making that the information should be obtained or can be obtained without exorbitant cost? We don't need to make that showing here. The agency here just said we don't need that type of information for this decision. The agency said not essential. It didn't back away from the conclusions that it didn't have information in the EIS. It didn't back away from the EIS's analysis of alternatives. It didn't back away from the EIS's statements that it can't analyze effects. What it says is not essential to this decision. That's an arbitrary conclusion in light of the limits of the analysis and the meaning of the regulation. If the court were to remand, the agency could, in the first instance, identify what information is essential or not by correctly applying the regulation. And then the regulation in the regular course requires the agency to gather that information. And, in fact, the agency is currently doing a lot of studies in the CHECGC and gathering a lot of information. It seems reasonable that if it decides that some of the information is essential, it would continue to gather that information and get that information that's needed for the lease sale decision. Of course, it can also make a separate conclusion, once it's identified that essential missing information is missing, that it's exorbitantly costly to get that. It didn't make that conclusion here because it just said nothing is essential, and that's the arbitrary conclusion. And I would just refer you to the supplemental excerpt of Record 183 through 195, which is a list of the ongoing studies that the agency is currently doing to gather important missing information about the Arctic Ocean. Now, as I've just been discussing, the EIS, we say, demonstrates that the agency cannot adequately analyze alternatives. And I'd just like to run you through an example of that, which is that the EIS analyzes three coastal deferral alternatives, which it picks based on limited information that the coast provides important habitat for species. But the EIS also acknowledges that other non-coastal areas in the Chukchi Sea might be important for species, key species, like bowhead whales and walrus. And that's an excerpt of Record 890 and 882 for bowheads, an excerpt of Record 826 for walrus. Now, the EIS acknowledges that disturbance in important areas could have negative effects on these species. Again, that's for bowheads at excerpts of Record 882 through 883, 905, and 911, and for walrus, 898, 904, 907 through 8. But it acknowledges that it's missing basic information about the use and location of offshore areas, which is that excerpt of Record 814, 882 through 84 for bowhead, and 896 for walrus. And as a result, the agency can't develop alternatives that minimize these effects in the offshore areas and, in fact, offered the whole offshore area to leasing. Similarly, the missing information even constrained the agency's analysis of the alternatives it did develop, the three coastal alternatives. The EIS contains just 10 pages of a comparison of the alternatives. They're at excerpt of Record 940 through 949. And because of the missing information, the only thing those pages conclude is that moving oil activities further from important habitat moves effects further from important habitat. That's it. There's no further analysis, and, indeed, the analysis repeats that conclusion verbatim for all of birds, fish, and marine mammals, and it doesn't even try to do a species-by-species comparison of those effects. These examples illustrate how the missing information constrained the alternatives analysis in the EIS and why the agency's conclusion that none of the missing information was essential to a reasoned choice among alternatives is arbitrary in light of those constraints. Your time is running. I want to make sure you save enough time to talk about the estimate of oil production at 1 billion barrels. Yes, thank you. The problem with the scenario is that the critical assumption underlying it is arbitrary because it conflicts with the EIS's conclusions about how development will occur. That assumption, as I've mentioned, likely caused the agency to seriously understate the potential level of harms, and this might have skewed the balance that's being done at the resale stage, which is a balance of the benefits of protecting areas against the benefits of development. That's the key choice. Part of what the agency said was that, you know, you can say there's X billion dollars reserved, X billion barrels reserved. We don't think they're going to probably be able to pump anything out effectively. So it sounds like, so we're going to say, all right, you'd have to at least get a billion to have anything effectively going on, and so that's what we're going to work around. Nobody in the world can predict what they're going to be able or not be able to do. I know it's not on the record, but I have some inkling that they're having an awful lot of trouble doing anything at this point. It might even be a different place, but I have some inkling that even enormous corporations can't seem to get anywhere, which makes their thought that it's probably going to be zero, but we'll take a billion just to have a number that nobody can predict anyway. Your Honor. I know I'm wrong. You probably think I'm wrong in principle or something, but is that about what's going on? Your Honor, what they said was, you're right, that they said that there will be no development at all unless a billion-barrel oil field is discovered. But then the EIS says, if that first field is discovered, development will flow out from there, and that's at Excerpt of Record 857 through 58 and at 973. Just taking a step back, the important thing to note is that a scenario is produced so that the decision-maker can get a sense of what the harms would be if development proceeded. It assumes that development proceeds. That's the whole point. It's supposed to tell the agency and the decision-maker what it will look like. Here, the likelihood of whether development will occur or not doesn't factor into that because the scenario assumes development occurs. That's what it's doing. After what they're clumsily attempting to do at this point, assuming that they can get a well drilled, aren't there additional steps in terms of development where they'll put more input and feedback and more opportunities to shut them down or to slow them down or to say you've got to do this and that? Was there some estimate it would take them 20 years to even get to that point? Something like that? Yes, absolutely there are subsequent stages and subsequent decisions. But at the lease sale stage, which is the stage we're dealing with here, there are fundamental decisions being made that cannot be made in the same way later. At the lease sale stage, it's the decision about whether to balance protecting areas or balance opening them. Later on, you can make different decisions, but you can only make an unfettered decision using the complete discretion of the interior to close off some areas at the lease sale stage. It's really important that that decision, the decision-maker has before her for that decision a non-arbitrary picture of what development might look like in the area if it were open to development. And the arbitrary flaw here skewed that picture because it said it just picked the minimum amount of development and analyzed the effects of just the minimum amount of development when the record is clear that if development occurs, it will occur differently and that there's much more than a billion barrels of oil that might be economic to develop from this area. There's 2 to 12 billion barrels of oil. And so as a result of this arbitrary departure point for the analysis that just conflicts with the record, the decision-maker got a very skewed picture. Now, I know this is not an Endangered Species Act case at this point. Was the 1 billion barrels of oil production used as the baseline when consultation was made under the ESA? I do not know the answer to that. I do, the answer is yes. I believe it was, yes. I believe that they, because in the biological assessment that was provided to the agency that came from the MMS and would have contained the same assumptions. That's right. But the ESA part of the case has been dropped at this point. That's right. But importantly, the 1 billion barrel assumption does play directly into what the agency has told the decision-maker about the chance of an oil spill happening at development. And so that's a critical feature of that. The basic idea being the more production, the more likelihood of the spill, sure. That's right, that's right. If there are no further questions, I'd like to save the rest of my time. Thank you. May it please the Court. Excuse me, I've had a cold. My name is David Shulton. I'm appearing for the federal appellees. I plan to share five minutes of my time with Mr. Parker, representing the lessee interveners. I'll turn first to the question of incomplete or unavailable information and then discuss the 1 billion barrel scenario. I think that the plaintiff's basic contention here is that there must have been at least some unavailable information that was essential to a reasoned choice amongst alternatives. But if you look at the Appendix A in the supplemental EIS that the agency did in response to the remand order, you'll see that the agency carefully considered each instance of unavailable information that had been identified by the plaintiffs and also that the agency identified and found that it was not essential to fill that gap at the lease sale stage. And it gave a number of very compelling reasons for that. The first is that there is a great deal of scientific information that is already known about this area. As counsel indicated, there have been a lot of studies that have been done already and they continue to be done. We know where the sensitive areas are for the animal migrations. They are generally near the coast. That is where the beluga whales and the bowhead whales migrate in the spring when the ice is first starting to break up, and they're concentrated there. And so that was the area that was logical to not lease, to put in a lease deferral. We know that. Yet the department made a choice. It chose Alternative 4, which is closer to shore than Alternative 3. And Alternative 3 had been recommended, was it by Fish and Wildlife? Yes. So the agency decides to come closer to shore. Based on what? Well, it's still quite distant from shore. I got that part, but I'm asking on what basis did it decide to come closer to shore with its leasing? Well, for a couple of reasons. First of all, there will be a great number of protections. Even if there is drilling, and we don't know that there will, in the area that would have been in the larger deferral, it will still be subject to the Marine Mammal Protection Act. And so they'll have to protect any whales against noise. There will be protection of other species that are endangered by the Endangered Species Act. So the agency has to consider and balance those considerations against, you know, the congressional direction that the agency encouraged leasing. Oh, sorry. Go ahead, please. Just following up on what Judge Fletcher asked, how does that justify coming closer to shore with the drilling as opposed to farther out, if the available evidence indicates that the presence of the animals to be protected are closer to shore? It would appear to me that it would be more prudent to go farther, to take the alternative that's more distant from the shore. And I don't understand your explanation as to why the other choice was made. Well, the agency has decided that there can still be drilling safely that distance from shore, which is in the southern part, it's 50 miles from shore. In the northern part, it's 25. The southern area is quite important. And it can be done safely because if there's any evidence of a problem, things can be shut down at any time. There are just an awful lot of protections that will occur. And there's further review, as has been mentioned, before the lessees can do any explorations. They have to submit an exploration plan to the agency. There's more NEPA done. That's reviewable by this court. And then before there's any production, the same thing, a production plan and an EIS. So there's going to be a lot of further review. And under this court's cases, like the Village of False Pass case and the Village of Accutan case, those cases have stressed that at the lease sale stage, you do not need to – having uncertainties is not a problem because you can get data as you go along, and you can add protections as you go along. That will be the same for any drilling, if it's ever proposed, in the area that's between 25 and 50 miles. The agency will get to review that. There will be further Endangered Species Act consultation with the wildlife agencies. What right is given by the lease to the lessee to drill? That is to say, let's assume that an oil company has bought a lease right there at the edge, closest to shore, permitted by Alternative 4. Oil is discovered so that it would be profitable to drill in that area of the leasing right close to shore. What happens if the government says, oh, you know, we just did another EIS. It turns out that's a little bit too dangerous. We won't let you do it. Does the oil company get to come back and say, well, wait a minute, we just bought a lease that allows us to do it? What happens? The government can do a number of things, up to and including canceling the lease. If it cancels, the oil company will be due compensation. But it can do a lot of things short of that to condition the time at which the drilling takes place so that they could not drill at specific times when the whales are migrating. Those kinds of restrictions on the timing of drilling have been done frequently to protect, for instance, subsistence. How about just production? That is to say, let's say the EIS concludes maybe five years down the road in light of more information or maybe more particularized study with respect to the specific location, that, you know, there's a real problem not just with drilling but with production because of the risk of spill. They could cancel the lease at that point because if there's a serious environmental harm is the statutory standard. If that's shown, then they can cancel a lease at that time. So there are lots of options. And it was just those kinds of options in the Village of False Paths case and the Accutan case from this court that caused the court to say, look, at the lease sale stage, the agency has to make projections and do the best it can, but the existence of uncertainties and unknown information is not a reason to not do the leasing. You do the leasing based on the best information that you have available. How often historically have leases been canceled? I don't know the answer to that question, but I do know that there have certainly been halts in, for instance, even in this area. You know, after the Deepwater Horizon event, things went on hold until the agency could be sure that any kind of going ahead would be done safely. So there are a lot of things that the agency can do even short of cancellation that would protect resources and that the agency has done. I think the concern of the plaintiffs is that once the train starts moving, it's really difficult to halt the process. And so it's kind of, at this stage, it's either stop it now or the pristine environment will never be restored. And this court in Village of False Past addressed that very concern and said that because of the staged nature of the Outer Continental Shelf Lands Act, that that concern is just not present here as it would be if this were the last decision, the last commitment the agency was making on something. But since it has these further opportunities, that that bureaucratic commitment concern is just not the same in this case. And I would also emphasize that plaintiffs here have brought a very narrow challenge to this court. They have not challenged the agency's particular choice of alternative four. Their challenge is simply that the compliance with this one CEQ regulation, 1502.22, was arbitrary and capricious because the agency did not find any particular information gap to be so essential that it had to be filled. And so our point is simply that the agency's compliance, which is shown in both Appendix A to the Supplemental EIS, which is the 98-page compendium of all of the pieces of missing information, but also Appendix E, which is all of their responses to public comments, including the plaintiffs, which explains in quite some detail why the agency concluded that no missing information was essential to be gathered, that that's not arbitrary and capricious. And since those judgments are made in a field where the agency is applying its expertise, I think that they get a fair amount of deference. So... I want to make sure you get to the one billion barrels. Absolutely. So we're at the lease sale stage, and the agency wants to describe in the EIS what the impacts might be if there is a development in the future, even though that's very speculative. So they need some sort of conceptual device for presenting that. You've got to make some sort of educated guess as to what might happen. And so the agency, I think, very reasonably here said, well, this is an area that's far from all present infrastructure, and so there are a lot of regulatory and engineering hurdles, and so the chances of there being any development at all are probably less than 10%. But since that could happen, we project that if there is any development, it will be a large development, about one billion barrels, and we'll base our analysis on that. You can correct me if I'm misunderstanding. As I understand the analysis of the agency, it is that in order for this to be economically feasible to go forward with development, the oil companies will really need to anticipate a production at a level of about one billion barrels. That's the minimum amount necessary for commercial production. But that's the minimum, meaning once you get to the minimum, once you've built the infrastructure, once you've done the underlying work that is very expensive, front-end and speculative, I see very little reason to assume that once you've got to the one billion dollar threshold, that that's the likely place it's going to stick. One billion dollar threshold is the point at which all of a sudden commercial development starts to happen, and we know from the agency's own figures that we've got many more. We've got 12 billion. We have a possibility of 29 billion barrels of oil there commercially developed. So I don't understand why the agency stuck with one billion when that is the minimum threshold for any commercial production at all, when if you meet the minimum, it seems to me entirely plausible, given the sunk costs at that point, that that will not stay at the minimum. That's just the minimum necessary to get going. Well, two points in response to that, Your Honor. First, while it's possible, and the agency has said that, after the one billion barrels, there could be more, still that the chances, given the hurdles, the engineering hurdles and the regulatory hurdles of that happening, are still very small, very speculative at this point. And second, there'll be another chance to look at this. But the chanciness is getting up to the one billion dollars. That's where the huge speculativeness, and I understand everything's always chancy. I mean, it's chancy that, you know, we're going to survive the afternoon. But the chanciness, the huge speculativeness, is whether you're going to get to the one billion. Once you've made the investment, once you're actually up to where you can produce a billion, that means you've overcome a lot of the uncertainties. Right, but we have to keep in mind that we're at the lease-sale stage here, and there will be another opportunity to look at that at the production stage. And so from our point of view... I'm more sympathetic to specific environmentally sensitive areas like migration routes or nesting areas or feeding areas with respect to where the actual drilling or production will take place, because that can be fine-tuned. But here we're talking necessarily, given the sort of this is overall leasing authorization, overall production, do we go forward with this at all or in what form? I think this is a general question that can best be addressed and maybe can best be addressed now and can hardly be addressed very well at a later time. Well, I think the Village of Falls Pass case looked at a very similar question. The question was, at the lease-sale stage, was it adequate for the agency to present an oil spill analysis of a 10,000-barrel spill? And the court said, yes, sure, it could be large, and there's a large amount of oil out there. But for the lease-sale stage, that is sufficient. Now, here, the agency did an oil spill analysis of a 150,000-barrel spill, a much larger one. Now, you can always do more. But, of course, that's premised upon production of a billion barrels. As I lease, as I read the record that the agency itself has compiled, the likelihood, once you reach one billion barrels of production, the likelihood of more is fairly significant. Well, I don't think that is necessarily true. I don't think the agency found any such thing. It's possible. But still, given this environment and the engineering problems, I'm not sure – I don't think the record would show that further development beyond a billion is – Well, I'll say it this way. The agency seems to have said, if there's going to be production, it's going to be at one billion barrels. The agency has, I think, said, if there's going to be production, it has then assumed the absolutely best case in terms of environmental, rather than anything close to the worst case or even the average case, assuming there's commercial development, because the threshold for commercial development is one billion. If there's less than one billion, we're not going to get the development at all, according to the agency. Right. But a one billion scenario is a very large scenario. But I think it's the best case. That is to say, if there is going to be commercial development, one billion barrels is the minimum, not even the average. Well, I think from the lease sale point of view, what the agency would normally do is say, what's more likely than not? And what's more likely than not here is no development at all. So it felt that it had to do – Well, if it's more likely than not, why is it giving us even a billion? Was it not required to do a billion? Could it have said there's not likely to be any development, therefore we can lease the land? Because even though it's only a 10% or less chance, that gave at least a basis for a conceptual scenario to analyze in the EIS. It gave a reasonable way to present what impacts might be. And NEPA doesn't require at this stage anything more than a reasoned analysis. I think the rule of reason indicates that this should be sufficient. I don't want to take too much of Mr. Harper's time. Thank you. Good morning. My name is Kyle Parker. I'm here today on behalf of the industry interveners. I'd like to jump right in and address what I think is a fundamental question here, and that is the information, the existing information, that supports the agency decision to proceed with leasing here. And I'll lead into the billion barrel scenario. I think there's a straightforward answer on this as well, Your Honor. The record is clear. If you refer to Appendix E in its supplemental excerpt of record, pages 87 through 94, as well as the supplemental excerpt of record, pages 151 through 156, the agency has provided the public with a comprehensive explanation of both the long history of working to develop information to support this decision to lease, as well as the analysis that's reflected in Appendix A for the missing information that we've heard about today. In terms of the information that's out there to support the decision to lease, there's over 35 years of studies that have happened here, and the agency has invested over $450 million in pursuit of different studies. Over 400 studies and over 300 peer review reports support the decision to lease. So this is not a situation where the agency was dealing with a dearth of information at the point in time it decided to proceed with the leasing. The record, again, is clear on that point, and referring to that will, I think, give the Court some assurance that they do have quite a bit of information. Counsel for the environmental groups referenced the ongoing studies. That is in Appendix E as well, and I would encourage you to look at supplemental excerpt of record starting on page 183. It's a listing of not only the ongoing studies but the recent studies that the agency has undertaken that go to supplement the information that was already there in 2007 at the time they began the process to proceed with leasing. Are you going to say something specific about 1 billion barrels? Yes, sir. I think the importance of the 1 billion barrels, the agency had to assume some scenario for purposes of analyzing alternatives, and they chose the 1 billion barrel number as the most likely situation that would trigger a development out there. They used that assumption then to go forward and evaluate the alternatives, which, of course, the environmental groups have not challenged here. They've not challenged the alternatives that were put forward by the agency in the selection of Alternative 4. So the 1 billion barrels is simply for purposes of evaluating alternatives. And an important point here, in particular, if you reference SES, the supplemental excerpt of record at page 93, the agency has provided a good analysis and statement as to the additional NEPA process that will be required before its development. I hate to interrupt, but your time is running. I have not heard you really respond to the concerns that I expressed. Let me express them again so you understand what I'm asking you to respond to. As I understand the agency's analysis, it is that in order for there to be commercial development, the oil companies are going to need to produce or anticipate producing about 1 billion barrels of oil. Below that number, we're not going to get any development at all. Therefore, they're using this minimum amount of production as their assumption of the amount of actual production. In my view, they have said, assuming there is production, we are going to assume the absolute best case for purposes of danger to the environment rather than the worst case, which could be 29 billion, or an average case which could be somewhere in between. Have they chosen the best case in the sense of danger to the environment assuming production rather than an average case or a worst case? Here, Your Honor, at the point in time when the agency was evaluating whether to proceed with the lease sale, they simply chose the 1 billion barrel scenario for purposes of evaluating alternatives for the decision to lease. The next step in the four-stage OXLA process for a company to come forward and propose development, the agency is going to have to undertake a specific analysis and environmental impact statement level analysis of the proposal that it comes forward with. If you don't have an answer to my question, you can say you don't have an answer, but I have not gotten one yet. I think, Your Honor, that at the lease sale stage, and the case law on this is clear, from the standpoint of evaluating alternatives, the agency had to make assumptions. Their assumption here, which was just the 1 billion barrel potential future development assumption was a reasonable one based on the record and based on the likelihood of whether we're even going to see development activities. Let me do it this way. Let me ask you, Your Honor, a very specific question. Assuming that there is commercial development based upon the agency's numbers, that's going to require an anticipated production of 1 billion barrels. Is that the best case in terms of danger to the environment assuming that there is production rather than the average case or the worst case? That's a yes or no. I'd have to say that the answer is no, that it's not a best case. Why is it not the best case? Because unless you get to a billion barrels, there's no commercial development. But I think, again, we're talking past each other a bit because for purposes of evaluation at the lease sale stage, and the evaluation of alternatives, they made this assumption of just 1 billion barrels. In terms of evaluating environmental impacts from a potential hypothetical future proposed development, they're going to have to go through this entire analysis all over again. It's not we haven't, and picking up on your comment, it's not as though the train has left the station and we're on the way to development. There are a number of steps that we have to go through and a number of additional agency reviews, opportunities for them to condition activities, all kinds of things that the agency can do to prevent any future development from a larger scenario that might come forward, a 2 billion barrel, a 5 billion barrel production. It just can't happen in the future. We can't come forward and say, we found 5 billion barrels of oil and we're going to go forward with development without the agency going through this whole review process again. And they can condition that in addressing the environmental issues to their will, frankly. So it's, again, it is a tool. Does it follow that the greater amount of production, the greater amount of risk of harm to the environment through spills or otherwise? Actually, not necessarily, because it really depends on a number of different factors. About location, we talked about the deferral areas and the areas that the agency decided not to lease. Again, based on the long administrative record that the agency had, they selected alternative 4, which had the 25-mile corridor, where they determined that they didn't want to have any leasing and activities within that corridor because of the importance for whale migration and subsistence use. So it really depends on a location where somebody might propose development, what the development looks like. And again, at that stage, the agency's got all the latitude in the world to condition the activities that the companies will come forward and propose. Thank you, Your Honor. Thank you. Thank you. Thank you. Thank you, Your Honors. I would just like to address four points, please. One is that the Village of Falls Pass, cited by the Appalese, is a very different case than the case here. In that case, the issue was the difference between the analysis of a 10,000-barrel spill and a 100,000-barrel spill. It was about the scope and the detail of impacts in a lease sale EIS that are already analyzed in the EIS. Here, the question is much more fundamental. The agency here lacks basic information to even compare the areas it's considering, and the lack of that basic information constrained its ability to make those comparisons and to make the critical choice at the lease sale stage about balancing the benefits of keeping areas free of oil and gas activity and the benefits of development. So those cases did not address the question here, Tribal Village of Occotan or Village of Falls Pass. Second, I would like to address the nature of the lease sale decision. Again, the point is that at the lease sale decision is the only time at which the agency has full discretion to open areas or, more importantly, close them to oil and gas activities, to any risk from accidents like oil spills to impacts that can't be mitigated later, like impacts to fish or birds that don't get the protections of the Marine Mammal Protection Act and other laws. And later on, the decisions that are made are much more constrained, and the burden shifts. For example, later on, the agency can deny an exploration plan in a particular area, or it can cancel a lease. But in order to do that, it has to make a finding that the activity would probably cause serious harm to the environment. That's a very different burden than what they have at the lease sale stage. And I would cite you to 43 U.S.C. 1334-A-2 for the cancellation authority, and 1340-C-1-A for the exploration plan authority. I'd just like to very briefly address why vacature, if the court were to find it in our favor, is critical here. Below, during the first remand, the district court did not vacate the lease sale decision, and during the remand reconsideration, the agency did exactly what it is forbidden from doing, which is it prominently factored in the existence of the unlawfully issued leases and the money that had been paid by the oil companies into its reconsideration. And that can be seen in the record of decision itself at Excerpt of Record 445, which cites the money paid for the leases as a factor in the decision. As a result, the integrity of the NEPA process is compromised by that kind of consideration. The NEPA process is supposed to have an agency gather information and inform its decision before it makes that decision, not to shore up the decision. And so to avoid that prejudice, vacature is critical here. And then I'd just like to finally address a point on the scenario, which is that the 1 billion barrel assumption absolutely affects the level of activity analyzed. If there's more oil produced, there will be more infrastructure and the effects will be larger. You can see that in the prior analyses referred to in our brief and also in the fact that the oil spill risk is denominated in spills per billion barrels of oil. So if you have more production of oil, you have a larger oil spill risk, and that's a very relevant factor at the outset here when the agency is determining whether and making the critical lease sale decision. If there are no further questions, I rest. Okay, thank you very much. Thank both sides for their arguments. Native Village of Point Hope versus Salazar now submitted for decision. And that completes our calendar for this morning, and we are in adjournment. Thank you.
judges: Fernandez, Fletcher, Rawlinson